Good morning, ladies and gentlemen. Our first case for this morning will be United States v. Naglevoort v. Novak. Mr. Bertocchi. Thank you, Your Honor. Good morning. May it please the Court, my name is Joel Bertocchi and I represent Ed Novak, one of the defendants in this case. A sufficiency of evidence argument is among the hardest to win in the law. It's a very daunting standard. What I hope to do this morning is to convince the Court that this case is a little bit different than most of them. It's an argument that's often made sufficiency but this case is different and it's different for three reasons. One of those reasons relates to the nature of the charges in the case and the other two relate to the character of the evidence of trial. Figuring out what hospitals, what kind of business arrangements hospitals can do with doctors is among the most difficult tasks in the law also. It's an extremely complicated regulatory framework. As the treatise that we cited in our reply brief indicates, it's a very quick statute and a lot of commentary, a lot of regulations and safe harbors. And whenever you see safe harbors, that's a sign of something. There's something you need to be safe from. There's a great deal of danger in anti-kickback cases that you're going to catch somebody who is maybe trying to go as far as he can but not too far. And he's not going to know where the line is. There are whole practice groups in law firms full of lawyers trying to figure out where the line is. And you go to these conferences, they don't agree with each other. So it's very murky to start. But you know, Mr. Bertocchi, you could say much the same thing about antitrust. There's a whole cottage industry of people who give antitrust advice to their clients and tell them you can do this when you go to your trade association meeting or that. And there are safe harbors in various antitrust guidelines. And nonetheless, some antitrust violations are per se violations. They're pursued criminally. There are grand juries that indict them. And there are people who sit in prison for violating those laws. I understand that. And I don't disagree with that. And I'm not saying that the anti-kickback statute can't be violated. All I'm saying is this is the filter that you have to look through to try to figure out or to look at a hospital executive trying to figure out what he can and can't do. So isn't the lens important? Obviously, you know, I would never say that this was a case in which the jury had to find guilt. It seems to me there was a tremendous amount of evidence going in different directions. But that's not the issue, of course. The issue is could the jury, based on this evidence, find guilt. And it seems to me the government has put together a fair amount of evidence indicating that Mr. Novak was aware that these were the forbidden kinds of referrals, payments for referrals, as it were, not fair market value services or any of the other, you know, the lease, all these other things that were going on. Well, Your Honor, I'm not sure if you're asking me when you say he was aware. There's a lot of evidence. There's a pretty fair amount of evidence that Mr. Novak was aware that you're not supposed to do things like this, although I'm going to say the contrary. Oh, right. No, I meant to say that, and it was happening, that he was also – No, Your Honor, I don't think there is, because – and again, this gets me to my second point about why this case is different. This is a case – this is not a case about white envelopes full of cash. One of the cooperating witnesses for the government testified in this case that he took KitKat somewhere else, and they left the money in cash and went on to – Weiss. Dr. Weiss, yes. So that happens. This is a case about contracts, and again, this is another, I don't know, filter or lens that you look through. This is a case where people did work, and the issue here is, did they do enough? That's a very tough standard to apply in a criminal case. I'm not sure that is the issue. I would have thought the issue was whether, when all was said and done, there was evidence from which the jury could infer or find that Mr. Novak, your client, was in a pay-for-referral situation, not in a, you know, we need this space, and so we're going to pay you so many thousand dollars for it, or whatever the other, you know, the free services from the hospital personnel or the various other things. That is the issue, Your Honor, but looking at the evidence, the government says, well, there were contracts. When they started this case, they said they were all shams, but then they found out difference. So the argument they made to the jury is they didn't do enough. And it's important to emphasize that the record in this case reflects that every doctor who had a contract did some of the work. The question then is, did they do enough? Was that your last argument? I mean, maybe the doctors did something, but the point is, I think, that if that something wasn't important enough to, I mean, you know, if they're doing 10% of the work and the other 90% is the kickback, right? Well, there was evidence that, some of the, there was actually testimony all over the case that they did 90% or different percentages of their work for Dr. Kuchipudi's patients. But what Mr. Novak was saying on the tapes about that is, they've got to be seeing other doctors' patients. They can't just work for him. That's a tape of a guy telling people they have to comply with the law. If they're just working for him, it's illegal. The government takes that tape and says, well, he knows the law, so he must be violating it. That's their argument, Your Honor. What about his comment at one point, you know, if I'm going down, you're going down too? Again, you have to take a look at context. That's a conversation where they're talking about an audit. It seems like it. He's talking about an audit and they're saying, and the hospital has been admonished by this group that's auditing them before. And so he's saying, you've got to make sure people keep their records because the auditors are saying they're not keeping records. And he said, we're going to get in trouble for this. And so, again, you're talking, you have conversations where somebody is trying to get people, you know, keep us kosher, which really can't be interpreted as inculpatory. Make it legal. Talk to outside counsel. Oh, all by itself. I certainly, you know, if you just say keep it kosher, that can't possibly be a problem. But, you know, this was an in-context kind of remark, I think, the government's position was. Well, they're all, yes, there are, Your Honor. And I would urge you to take a look at context when you look at those recordings. Because when Mr., the one remark that was seized on by the government a lot of trials, Mr. Novak talks about, make sure our, cover our asses. Pardon my language. He says that a number of times. He says that a number of times. He said it to me. But that's a phrase that can be interpreted in a number of ways. But look at the context. When he's having a conversation with somebody are we doing our jobs? Are people doing the work they're supposed to be doing? Is somebody going to the May Clinic? If not, we have to correct that. Those are not the kind of conversations you normally have in this kind of case. Well, except I wonder if it is. Because, look, if they are, as the jury found, engaged in the kickbacks and the impermissible referrals, they don't want to just have it right out there in trying to conceal it under the umbrella of something that looks more legitimate. So you've got to kind of disaggregate this. Yes, but bear in mind, Your Honor, these are recordings made, almost all of which, the main ones, are made between Mr. Novak and his number two guy and supposed co-conspirator. There's no reason in these, Perot, Anthony Perot, and there's no reason for Mr. Novak to talk that way if he's talking about concealment. If he doesn't mean follow the law, he's not going to say follow the law. He's going to say make sure this looks good. The kind of conversations that you would see if he was concealing, I mean, there's never been any hint in this case that Mr. Novak had the slightest idea he was being recorded. Mr. Wartage, you're in your rebuttal. I know. I just thought I caught your attention. Well, then I'll sit down and save the rest. Thank you. That would be fine. Mr. Campbell. Thank you, Your Honor. May it please the court. My name is Terry Campbell. I represent Clarence Nagelhort, one of the defendants in this case. I want to touch on a few of these. Considering your size, Mr. Campbell, would you raise that, no, underneath there's a little button. If there's a button and if it goes down, just press it again. Oh, there we go. See? Wonders of modern science. You can do more. You're taller than you think you are. I think it's at its limit. I think it's up there, yeah, right. Okay, then speak loudly. Thank you, Judge. You're talking to an old man. This is an unusual case, and even more so with respect to Mr. Nagelhort. And I want the court to please keep in mind, Mr. Nagelhort was an outside consultant for the period of time. He had no ownership interest in the hospital. He had no interest in the profits of the hospital. And with respect to the evidence in this case regarding the transactions, the contracts, the agreements that Mr. Nagelhort was involved in, the evidence is sorely lacking as to any intent to do anything improper, much less to willfully violate the anti-kickback statute. So you don't have any of the earmarks, as Mr. Bertocchi said, throughout this. In particular, with respect to the contracts and agreements Mr. Nagelhort was involved with, all those contracts are documented. All those contracts with doctors, the work called for was actually done. It was actually done. And I'm happy to talk about any of those contracts, the ones with Dr. Moshiri to teach residents. The government, in its response, says Moshiri did very little, if anything, with respect to the residents. Other than conducting 585 surgeries with residents, that is documented, I suppose he did very little. But those are the requirements for Sacred Heart to have its podiatric residency program. With respect to the leases, the lease with Dr. May, which was in existence before Clarence Nagelhort started his consulting with that hospital, the only thing Clarence Nagelhort did was reduce the amount paid for that lease from $5,000 to $2,000. That's not the act of co-conspirator. It was the act of somebody who was in the role of operating officer of the company recognizing that the hospital, and this is undisputed evidence, the hospital was using the space at Dr. May's office less frequently than it had at the outset of that lease, and he reduces that amount. There was no evidence in the record that Dr. May was ever a significant source of referrals to the hospital for anything in any event. There are zero tapes, no tapes involving Clarence Nagelhort. He was gone over a year before any of these tapes were made, so you don't have anything inculpatory on any of the tapes with respect to Clarence Nagelhort. What about his role in discussing with outside counsel this opinion letter they were after? The government says that he, in particular, Mr. Novak as well, was responsible for giving misleading information to Lebeau. This has always puzzled me. The issue of giving misleading information at trial, the government's argument was the misleading information that Mr. Nagelhort gave to Attorney Lebeau was this, that he said in one of his emails, we can't afford to hire a PA, positions assistant, full time, and that's why we want to do this employee sharing arrangement. Attorney Lebeau... And this was at a time that they actually had a couple of full time people on the staff. That's right. But Attorney Lebeau was asked directly, does it matter whether they could afford or not afford a physicians assistant full time? And she said, irrelevant, entirely irrelevant and immaterial to my opinion. That was her testimony when I examined her. So the one misstatement, if you want to call it that, that Clarence Nagelhort is alleged to have Attorney Lebeau said was absolutely immaterial to my opinion. The fact is Mr. Nagelhort spent seven months in discussions and not constant because Attorney Lebeau was occupied with other things and you see the iterations of her opinions in the exhibits, but her opinion never changed. There is nothing improper about having this type of shared employment relationship. But it seems that the employment relationship, and this is a complex record, so I'm trying to keep it all straight. One of the problems was that these people were essentially potentially double dipping, that the provider was working for the hospital and being paid by the hospital and the physician was at the same time able to bill Medicare, Medicaid. Here was the testimony about that. And keep in mind, Clarence Nagelhort was there at the outset when this relationship was developed. He left in April. This relationship with Joanna Suanos really started in December of 2010. So he's there for the first couple months of it. The idea was let's share the employment. They did that. Dr. Kuchiput and going in, the idea was about a 75-25 split, 70-30, 75-25 in terms of time and in terms of salary. And that's what they did. In fact, they had Joan Lebeau and she testified about this. They had Joan Lebeau do some fair market value research on what the appropriate salary would be for a physician's assistant inside the hospital versus outside the hospital. Joan Lebeau testified. Outside the hospital, a physician's assistant at that time probably was about $65,000 a year. Inside a hospital, about $100,000. They divided the salary fairly and appropriately. Joanne Suanos worked outside the hospital for Dr. Kuchiput when she worked inside the hospital. She worked for all patients. And I'll tell you, the only tape, the only tape admitted into evidence in this case that had any real direct evidence about what was in Clarence Nagelvort's mind was a defense exhibit. The government didn't play this tape. But Tony Puro, working for the government and trying to get inculpatory evidence against Clarence Nagelvort, has a conversation with a gentleman named Ernie Velasquez. Not called at trial, but the tape comes in. And Puro is trying to get Velasquez to say, Nagelvort designed this in order just to benefit Kuchiput. It's defense exhibit B-220. And Velasquez says, no, no, no. Nagelvort told me at the time, Joanne Suanos is there to see all patients, not just Dr. Kuchiput. When she's in the hospital, she is to see all patients at the hospital. So the question is, again, it's really the same thing I asked Mr. Bertocchi. Even if you could see the evidence that way, when you put your hat on and you say, could the jury have concluded that Mr. Nagelvort was aware that the kickbacks were going on, that the paid referrals, I guess I should call them, were going on, there seems to be evidence that he was aware of this. There is no evidence that he was aware that anything was improper. In fact, the only evidence that the government relies on is the fact that there is a financial relationship and the fact that a doctor in that financial relationship refers patients. All the rest is argument. He's the chief assistant, really. What's his title? He's like the CFO or something? He acted as the chief operating officer. COO. Okay. So he's deeply involved in all of these things. He's talking to Novak all the time. There wasn't evidence about that, really. The fact is, as I said, with respect to each of the contracts he's involved in, the people did the work. The government did not put on one iota of evidence about fair market value. Well, some work. We'll have Moshiri in the next case, although this is all sort of one big thing. Dr. Moshiri did 585 surgeries over the course of a few years with residents, which is required by the CPME in order for the residents to become doctors. That is essential work. You have to have cases and you have to have surgeries and procedures. To attack Dr. Moshiri's contract, I would love for the court to look into what the evidence was about what Dr. Moshiri did and how valuable that was. I want to touch. If you want to save a minute, you can save or not, as you wish. On withdrawal, I think the issue of the insufficiency of the evidence is made even more manifest when you look at the fact that there is no question that Clarence Negovort sufficiently withdrew from any alleged conspiracy. He terminated his employment unequivocally. He never had any contact whatsoever with Sacred Heart. Did he do anything about stopping it from going forward? I'm sorry? Did he do anything about stopping it from going forward? Just in an academic sense. Yeah, I guess the answer is, to the extent that the government's argument is that he was promoting it, he stopped aiding and assisting in any of that. But he did nothing further? He didn't do anything further, nor do I think the law requires him to, under all the cases that we cited about business conspiracies, which say when you withdraw, when you quit, when you abandon any future involvement, and when you receive no future benefits, that constitutes withdrawal. That is disavowal of the conspiracy. All right, you have your minute. Thank you very much. Mr. Kutcher. Morning, Your Honors. May it please the Court, my name is Matthew Kutcher on behalf of the United States. The jury's verdicts in this case were supported by abundant evidence, which proved that defendants knowingly and willfully caused Sacred Heart to pay doctors for patient referrals. They set up dozens of arrangements that appear to be legitimate, but in reality were mechanisms to pay doctors for patients. That evidence included testimonies of doctors themselves who received the quid pro quo payments. They talked about their arrangements and the contracts that were used to cover them. The evidence also included defendants' own statements about these His name was Suresh Shah, that in exchange for a physician's assistant, he would need to provide five to ten patients per month to Sacred Heart. The evidence also included recordings in which doctors came to Mr. Perot seeking payment and Mr. Novak seeking payment, their checks, and they talked explicitly about their patient admissions and payments. So what's so crazy about somebody in Mr. Novak's position heading the hospital talking about patient admissions? You would think that any hospital chief executive officer would be concerned to see if the hospital is, you know, doing its business properly. That's right. So the evidence about a CEO talking about admissions or... You know, we have too many empty beds, you know, what can we do? Maybe we should run an In and of itself, there's no problem with a CEO talking about the hospital's admissions or, as is in the record, a CEO talking about expenses. And it is true that in this record, Mr. Novak was acutely aware of admissions and expenses. And why not? I mean, the Chicago market is a very competitive market for hospitals. So what do we take from that? Absolutely. But in and of itself, first of all, the record shows that he was acutely aware of admissions for these doctors, the doctors that were receiving these payments. So the evidence shows that he talked about, for example, in a memo when he was budgeting for the hospital admissions for Dr. Kandala and Dr. Kuchipudi in particular. Or in the recordings, he talks about Dr. Kandala's admissions and he needs to get them up because he was withholding the check and Dr. Kandala wasn't providing admissions. Well, again, even if a CEO is looking at particular doctors, you would agree, wouldn't you, if there's no quid pro quo involved, maybe the CEO is just monitoring what the doctors are doing. Absolutely, Your Honor. But that wasn't the only evidence in the case. This case wasn't. It's the payment. And I think critical to the provision of physician services, whether it's the teaching contracts, whatever the other devices were, there was some reality and a lot of fiction to them, I guess is your theory, or that the jury could so have found. And the fiction part is what ensnares them. That's right, Your Honor. So, for example, Dr. Shah. Dr. Shah was an oncologist. He had a ported contract to create a cancer screening program. His testimony was that his understanding was he was being paid for patients. It was Negelvort, wasn't it, who said, when he said, was he the one who said, I don't have enough time to do this? And Negelvort said, just sign it? That's right, Your Honor. He said, just sign the contract. Dr. Shah came to Mr. Negelvort and said, I can't do the things that are in this contract. And Mr. Negelvort said, just sign the contract. And this was after a discussion where Dr. Shah explicitly talked about he was looking for a place to refer his 250 patients. Doesn't that take a leap of logic, though? Negelvort says, just sign it, and you could imagine the implicit part of the sentence being, and we'll pay you anyway, which would be a problem. Or you could imagine the rest of the sentence being, I'm sure you'll find a way. Maybe we can work this out so that you can do it. Maybe it won't be as hard as you think. In other words, there may be a benign explanation. How's the jury supposed to have a basis for one or the other? Sure, Your Honor. There was other evidence in the case about Dr. Shah's conduct that would give context to that statement. So for example, Dr. Shah then testified that he didn't do much of the work that's in that contract. Sure, he had a cancer screening fair here once in a while. Yeah, a fair every couple of years. Every couple, that's right, Your Honor. Every couple of years, which he spent maybe six hours doing. So the evidence was that he didn't do that. The evidence was that he testified that he filled out fake timesheets, that he put nonsense in the timesheets that then he submitted for this. And the evidence was that when- And who knows about that? Novak and Nagelvord? Other people? They have to know, right? They do. And this goes back to how involved Mr. Novak was in every expense in the hospital. He would review the timesheets. He was the one who was signing off, he and Mr. Nagelvord and Mr. Paywall, signing off on all of these checks. Was there evidence about that as Novak's role, that he did it just in these particular cases, with these particular doctors, or was it his practice to sign off on leases and contracts for everybody? The evidence was that he was signing off on everything in the hospital when appropriate. That is, when he was there, he would do it. When he wasn't there, Mr. Nagelvord could do it. But there is evidence that he was signing off on all types of contracts. That is true. But the evidence is also that he reviewed every expense down to- He was reviewing, according to one tape, a $28 expense questioning that. So when he was reviewing, you know from the record in this case that he was really reviewing it. And the other piece of evidence with respect to Dr. Shah was that when Dr. Shah had a stroke in, I think it was 2011, and he said he could no longer refer patients, the payments just stopped. There was no question about his cancer screening program. There was no discussion about that. What are we going to do about this cancer screening program? The payments stopped. And that is consistent and corroborated by other doctors. Dr. Weiss, for example, the same pattern. And this one was where Mr. Novak spoke directly with Dr. Weiss, and the same thing happened. He said he had patients he wanted to refer. They came up with a contract, a teaching contract. He testified that he didn't perform under that contract. He kept a ledger of what he called illegal payments from, or words in that substance, from Sacred Heart. And then when he had to close his practice that was near to the hospital and told Mr. Novak that he would no longer be able to refer patients, the payments stopped. And again, no discussion about what are we going to do about your teaching in the podiatry program. It was connected to the payments. Now, if there are no further questions on the sufficiency, I can turn to withdrawal. Mr. So other than taking this bonus at the time of, I guess they're calling it the firing, a little odd that he would go and say, please fire me. But anyway, I guess that's what he said. But other than taking this money, which is just a couple of days later, what else did Mr. Nagelvord do? What, in the government's view, should he have done in order to complete the act of withdrawing from the conspiracy? To answer the first part of the question, he did nothing. He was terminated from, and the only stipulated fact- And had no more financial relationship with Sacred Heart. Other than cashing the $30,000- Other than cashing the $30,000 check. Correct, Your Honor. That was just three days later. So let's say he withdrew not on April the 28th, but he withdraws May 1st or whatever. That's right, Your Honor. He had no- Why not? Why shouldn't we find that? Can you repeat the question? May 1st. Yeah, I'm extending his participation through the cashing of the check. Understood, yes. So to answer your question, that's right. That was the last financial dealing that is in the record. The record on which the district court based its finding that there was no withdrawal in a matter of law was the stipulation that simply said, Mr. Nagle-Wharton is terminated from his employment, and he received no financial benefit after that date. He took no further action. And to answer the second part of the question, what could he have done? In the Seventh Circuit, there needs to be more than simply ceasing activity. He needs to take some affirmative act to defeat or disavow the conspiracy. I mean, short of calling your office, I mean, I assume if he had come over here to the Dirksen building and had a meeting with the U.S. attorney, that would have been enough. But other than that, is there anything else? Well, he could have actually done something to stop the ongoing violations that he set in motion, that he specifically set in motion. So for example, he could have gone and talked to Dr. Kuchipudi and said, you know what, we're providing you these physician's assistants, these nurse practitioners, these doctors in exchange for your patient referrals, that has to stop. Or he could have said that to Mr. Novak, I'm expecting you to tell everybody else, this must stop. He needed to do some more affirmative step. From the record in this case, we don't know what he even said to Mr. Novak. And in that sense, the inference that the jury could have drawn and that the district court could have drawn was that during that conversation, he said, good luck to you. I hope you succeed in this. Thank you for your $30,000 check, which would put him in the Valone category, which is exactly the facts in Valone. He wrote a letter. Mr. Hopper wrote a letter to the other conspirators and said, good luck. And the Seventh Circuit found that was not enough for withdrawal. Now, I mean, people say stuff like that when they leave a place of business, even if they don't mean it. To tell, you know, they'll say, good luck, or it seems pretty meaningless. That is true. I would think the jury can infer that taking a $30,000 check is not meaningless. The money may be a little different. So Mr. Campbell has argued that business conspiracies are somehow different from drug conspiracies or other kinds of conspiracies, wire fraud conspiracies. And in business conspiracies, you just have to leave. Right. And I don't believe that's what those cases say. The cases that he cites, the Nerlinger case in the Second Circuit or the Morton's Market case in the 11th, there is, on the facts of that case, the affirmative step. The affirmative step is, in the Nerlinger case, closing the account by which that co-conspirator's conspiracy was able to effectuate itself. Some sort of disabling act, like selling the dairy farm or, you know, closing the account. That's right, Your Honor. There is no difference in this circuit between a business case, or there should be no difference between a business case and any other type of case. Well, in a drug case, if a member quits the organization and no longer participates, is that not enough? Again, I would imagine it's fact-specific, but likely no. The co-conspirator in a- Is he supposed to stop his co-conspirators from selling drugs? He's supposed to take some affirmative act to disavow or defeat the conspiracy. So it's a good example, Your Honor. In a drug case, you can't just submit your letter of resignation, right? Somehow you can stop- Just saying I quit is insufficient. Pardon me? Just saying I quit is insufficient. That's right. It's insufficient, going to the other- As far as a drug conspiracy, it's also dangerous, but go ahead. That's right, Your Honor. As this Court held in Patel, you can't walk away from a ticking time bomb. And that's exactly what Mr. Naglevort wants this Court to believe here, that it was okay for him to say, I quit and let all of these illegal payments just keep going. The very payments that he set in motion. So to Novak, I quit and you should stop this. Would that have been enough? Again, Your Honor, it would depend on how he said it. But if he did say something more affirmative, that yes, that I do not believe in this and we should tell all of our co-conspirators. That I don't believe in this, that might be sufficient under those facts. So one of the arguments, moving back to the sufficiency of the evidence for a moment, that Mr. Novak stresses in his brief is a lot of things he says sound on the surface quite benign or even good. You know, let's keep this kosher or whatever. But the government has taken these all to be said with a wink and a nod, essentially. We need more than just that guess, don't we? Well, yes. With respect to the recordings, again, this is English language. The jury listened to them. They could understand the English language has nuance. And they could listen to those recordings in context, both in the context of a seven-week trial with 57 witnesses and also in the context of the recordings themselves. So, for example, in the recording in which Mr. Novak says, we need to make it legal. The context for that is Dr. Stambouli. Dr. Stambouli was working exclusively for Dr. Kuchipudi. Mr. Pearl came to Mr. Novak and said, we need to pay Dr. Stambouli for that work. Mr. Novak, in a part of the recording, says, well, he can't just work for Dr. Kuchipudi. He needs to be a hospitalist, which means work generally. I take it the theory of the problem of just working for Dr. Kuchipudi or Dr. X, whoever it might be, is that just as the hospital can't pay dollars to somebody for referrals, the services are functionally dollars. They're a thing of value that are being conferred. That's right, Your Honor. And the record shows that Dr. Stambouli wasn't even billing for his time. And he wasn't billing- For all this coverage. Yeah, this was a very strange part of the arrangement. Actually goes for two years or some lengthy period of time without any money. Yes, Your Honor. The record shows that he went for two and a half years without any money, came looking for the money because Mr. Nagelbord had promised that Sacred Heart would take care of him. And when he comes and looks for the money, the recordings make clear that Mr. Novak knows exactly what's happening here. He at first says, I don't know what you're talking about, but Mr. Porro explains it. And he says, that would be inducement. We can't do that. And so he says, Mr. Novak says at different points in this conversation, go to the outside counsel, make it legal. And by that, the jury could have inferred what he meant was get legal cover for this, get a contract. And what he says is the contract should be for a hospitalist, not seeing just Dr. Kuchipudi. And it should be retroactive. It should cover- They pull it from April, what is it, 2013 back to 2011. Correct, Your Honor. It's handwritten in. And that is exactly what happens. They make a retroactive contract that does not accurately reflect what happens. And so what happened with this arrangement? And so when he said, make it legal, he meant, or the jury could infer, that he meant, let's go get some legal cover for this. Go ahead. The court has no further questions on that. I can turn very briefly to the Barassi argument that Mr. Nagelvort raises. Mr. Nagelvort attempts to challenge the constitutionality of this court's reading of the anti-kickback statute that it applies when any part or purpose of a payment is made for a kickback. And in this case, that's an as-applied challenge. And there's really no, there isn't much dispute, at least. Would it make a difference in this case? I mean, reading the government's brief gives me the impression that you are arguing that you would survive even if it were a substantial part. In this case, the evidence was substantial. I mean, I know that's not what the jury was instructed. I mean, so there's some fuzziness there. But this doesn't seem like the 5% of the contract was phony and the other 95% was correct. That's right, Your Honor. With respect to most of these contracts, the majority of the contracts, the substantial part of the contracts, were for a substantial amount. If you thought that's what the First Circuit test is, and if you thought that's what we were doing, which contract doesn't satisfy that? I don't believe there's any contract in the record. I mean, the lease, they were using the space in the lease, weren't they? The $5,000 lease? I thought they were. They were using some of the space, but the evidence in the record demonstrated that they weren't using it sufficient to cover a $5,000 payment. And that was evidence. So was there evidence of what medical lease space goes for in the Chicago market? How do we know that $5,000 was a bad price? Well, there wasn't expert testimony on that, there was testimony about other leases, other similar spaces that was getting much lower rent than that in the $5,000. How about the $2,000 that Mr. Nagelvort pulled it down to? Is that more reasonable? Well, again, it is. With respect to that, the record is Mr. Nagelvort pulled that down at exactly the same time that he provided a physician's assistant to Dr. May. So there is some question about whether the amount that Sacred Heart was paying for that space changed at all. And in fact, what happened was as the admission, as Dr. May's referrals went down, Mr. Nagelvort pulled the PA as well. Now, whether or not the $2,000... That's why you're saying that it's sort of something backfired, you know, I guess they lowered the prices and Dr. May just decides, okay, I'm not going to refer as much? Is that what happened? That could be an inference that the jury could have taken from that. The other inference could be that they were tying the payments to the amount of referrals. And the evidence in the record was that they actually reviewed Dr. May's referral levels when they decided to withdraw the physician's assistant. And so there was a reasonable inference that they were connecting that. It could be as much of an inference as any other there. But we think the most reasonable inference would have been that he was connecting those, that Mr. Nagelvort was connecting those two things. If the court has no further questions? I think not. Then the government respectfully requests that the court affirm the convictions and sentences in this case. Thank you. All right, thank you. So back to you, Mr. Bertocchi. Your Honor, the government, as they did in their brief and as they've done today, on a number of cases is trying to make a silk purse out of a sow's ear. Page 70 of their brief, talking about the tapes that you mentioned that sound exculpatory, they make the amazing argument, it's amazing to me as somebody who's been on both sides of tape cases in this district and this circuit for a long time, that these tapes were played without explanation so that the jury could decide what they meant. That's not the way it's done unless that's the only way you can do it. I was involved in cases on both sides. The idea is you put a witness on to say when the guy says make it legal, he doesn't really mean it. He means something else. The government says that's the way Mr. Novak talked, but there's no evidence for that. Why couldn't the jury have taken that as an item though and then looked at what was actually happening and looked at the statements from the doctors and looked at everything else? There's no testimony from any doctor that Mr. Novak ever talked to them about bringing in patients. That doesn't exist. Take a look at the example Mr. Kutcher gave. But does that suggest Mr. Novak doesn't know that this is what's happening? A person who is, let's just say, a careful manager of his hospital? Well, bear in mind, Your Honor, Mr. Novak can be, as you suggested, keenly interested in the census. He can be keenly interested in referrals. Under the McClatchy case from the Tenth Circuit, he can hope for them. He can expect them. He just can't make a deal. So the fact that he might be talking about them, even in the context of a doctor, that he might say, and I don't think there's a tape like this in the record, but even that he might say, you know, if we hire this doctor to do this job, maybe he'll bring patients. I would assume that's something that is thought about in bringing doctors to hospitals all the time. That's not illegal. The example that Mr. Kutcher gave of Dr. Stambouli. Yes, they look at it. I'll give you one more minute to wrap up. Thank you, Judge. You look at it in context. The context for the backdating of the contract is that it was done after Mr. Novak reviewed it by the hospital's outside counsel in consultation with Mr. Perot. So again, the question is, what did Mr. Novak know? The government over and over in this case is confusing motive with intent. And that goes beyond what Jackson v. Virginia allows. Okay. Thank you very much. And I think you have a minute left, Mr. Campbell. Thank you, Your Honor. And I want to make two quick points, if I can. One is with respect to the Dr. Jagdish Shah contract that the government talked about. The fact is, Your Honor, if you look at the record, Dr. Shah testified he did do the work that was called for under that contract. We've laid it out. It's on page six of our lead brief. And it's on pages 10 and 11 of our reply brief with citations to the record. Dr. Shah's testimony was, I didn't do a lot of stuff that was new. But the whole purpose of this arrangement was Dr. Shah said, I've been doing a bunch of additional work for you guys. Can I get paid for that now? And Clarence says, I'll talk to Novak. He comes back and says, yeah, we'll pay you $2,000 a month. Dr. Shah was worth, he testified, $4 to $5 million at the time. The idea that he would sell his soul for $2,000 a month is simply not believable. But he did the work. He did the work in its document on withdrawal. There is a confusion in the government's argument between disavowal and defeat. You are not required to defeat the conspiracy in order to withdraw. You are required to disavow it. And the cases we cited, Nerlinger, the dairy case, leaving the conspiracy, depriving them of any of your work and not receiving any future benefits constitutes disavowal. His only mechanism to participate in the conspiracy was his employment. He asked Novak to fire him. He was fired. And on April 28th, he got a check that was severance pay for unused vacation. And he cashed it that day. It hits the bank a couple days later. There is nothing in the record that would support his continuation in any alleged conspiracy. And it ignores the realities of how business conspiracies operate to say that you have to do something in addition to saying, I'm no longer participating. I'm terminating my employment. And I have no contact. All right. Thank you very much. Thanks to all counsel. We'll take the case under advisement.